FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

2006 MAR -7 PM 3: 25

CLERK _L. Flendon_
SO. DIST. OF GA.

LEONARDO DEL ROSARIO and EVELYN    *
WEST, Individually and on          *
Behalf of a Class of all Others    *
Similarly Situated,                *
                                   *
        Plaintiffs,                *
                                   *
    and                            *
                                   *
WARDINE F. TAYLOR, JOHN A.         *
PARKER and EVELYN G. NAZZRIE,      *
Individually and on Behalf of      *
a Class of all Others Similarly    *   CV 204-036
Situated,                          *     (Consolidated with
                                   *      CV 205-044)
        Plaintiffs,                *
                                   *
    v.                             *
                                   *
KING & PRINCE SEAFOOD CORPORATION, *
KING & PRINCE SEAFOOD CORPORATION  *
EMPLOYEE STOCK OWNERSHIP PLAN,     *
ROBERT P. BRUBAKER, DENNIS J.      *
SULLIVAN, JOHN L. WILLIAMS, and    *
GUY STILL,                         *
                                   *
        Defendants.                *

---

**O R D E R**

---

Plaintiffs move to certify a class of former employees of

Defendant King & Prince Seafood Corporation ("King & Prince")

in this case brought pursuant to the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et

DHB (34)                                    CCC: _____

AO 72A
(Rev.8/82)

seq.[1]  Upon consideration of the evidence adduced at a hearing held on September 12, 2005, the parties' briefs, and the relevant law, Plaintiffs' Motion for Class Certification is **GRANTED.**[2]

## I.  BACKGROUND

Plaintiffs are former employees of the King & Prince, who participated in the King & Prince Employee Stock Ownership

---

[1]  The motion for class certification was brought by the named plaintiffs, Leonardo Del Rosario and Evelyn West, in the case of Del Rosario, et al. v. King & Prince Seafood Corporation, et al., CV 204-036.  The consolidated case of Taylor, et al. v. King & Prince Seafood Corporation, et al., CV 205-044, is also a putative class action although the Taylor plaintiffs have not moved for class certification.  In fact, on July 29, 2005, the Taylor case was stayed pending a determination of the class certification issue in the Del Rosario case.

Upon review of the proposed class definitions in the two cases, it is evident that the Taylor class would be a subclass of the class sought to be certified in the Del Rosario case. Accordingly, this Court heard testimony and evidence regarding the named plaintiffs in both cases at the September 12, 2005 hearing.  Moreover, any reference to "Plaintiffs" in this Order includes all named plaintiffs in both the Del Rosario and Taylor cases.  Indeed, these cases were consolidated for all purposes by Order of July 29, 2005, as modified by the Order of October 18, 2005.

[2]  There is a motion for partial judgment on the pleadings pending in the Del Rosario case and a motion for partial dismissal of the complaint pending in the Taylor case. Generally speaking, courts should consider motions for class certification before ruling on dispositive motions.  E.g., Adair v. Johnston, 221 F.R.D. 573, 576 (M.D. Ala. 2004). Nevertheless, I will address certain issues herein that can be decided on the pleadings because it will facilitate consideration of the class certification issue.  See Section II infra.

AO 72A
(Rev.8/82)

Plan ("ESOP") during their employment.  They brought this action seeking recovery of benefits they believe they are owed under the ESOP pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).  (Am. Compl., Count One.)  Plaintiffs also allege that Defendants breached certain fiduciary duties owed to them under ERISA, asserting this claim pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).[3]  (Am. Compl., Count Three.)  Finally, Plaintiffs seek class certification with respect to their claim for breach of contract, specifically, the terms of the ESOP Plan Ownership Document which governs the ESOP.[4]  (Am. Compl., Count Five.)

## A.    The Plan

The King & Prince ESOP is a company funded and maintained

---

[3]    The Court recognizes that Defendants have filed motions in which they contend that Plaintiffs may not assert a claim for breach of fiduciary duty under ERISA as an alternative to their claim for benefits.  (Brf. in Supp. of Defs.' Mot. for Partial J. on the Pleadings, at 7-9; Brf. in Supp. of Defs.' Mot. for Partial Dismissal of the Compl., at 8-12.)  This issue will be addressed in Section II *infra*.

[4]    The Court recognizes that Defendants have filed motions in which they contend that the breach of contract claim is duplicative of Count One and should be dismissed. (Brf. in Supp. of Defs.' Mot. for Partial J. on the Pleadings, at 7-9; Brf. in Supp. of Defs.' Mot. for Partial Dismissal of the Compl., at 18-19.)  This issue will be addressed in Section II *infra*.

AO 72A
(Rev.8/82)

retirement plan that took effect in 1991.[5] The ESOP is funded by a Trust invested primarily in King & Prince stock; thus, participants have a stock ownership interest in the company. The ESOP was also designed to finance the company in that the company borrowed money to fund acquisition of the King & Prince stock and then repaid this loan over time through its contributions to the Plan.

Defendants Dennis J. Sullivan, Robert P. Brubaker, and John L. Williams were Trustees of the ESOP during all relevant times, while Defendant Guy Still was the Assistant Treasurer.

An employee who meets certain requirements automatically becomes an ESOP participant and is not required to make contributions.  Instead, the company makes contributions to the ESOP on the qualified employee's behalf based upon the employee's annual compensation, defined as the "total salary and wages paid during a Plan Year."[6] (1991 Summary Plan Description, at 7.)

The King & Prince's fiscal year for the corporation is

---

[5]  Prior to the ESOP, the King & Prince maintained a profit-sharing plan for its employees.

[6] The formula by which the company's annual contribution is determined is as follows:

| Employer's Discretionary Contribution of Net Profits | X | Employee's Compensation |
|---|---|---|
| | | Total Compensation of All Eligible Plan Participants |

(1991 Summary Plan Description, at 5-6.)

4

the same as the calendar year, but the ESOP's plan year runs for fifty-two weeks following the end of the second quarter of the King & Prince's fiscal year.  The ESOP's plan year ends on the last Saturday of June each year.  This is known as the "Anniversary Date."  The value of the stock held in the ESOP Trust is determined each year after the end of the plan year, usually in late August or September. Each plan year is denominated by the year in which the plan year begins; thus, the 1999 Plan Year commenced in June 1999 and ended in June 2000.

The ESOP Ownership Plan Document distinguishes between two classes of participants in terms of eligibility for distributions from the ESOP: (1) participants who have left the company due to retirement at age 65, disability or death; and (2) participants who have left the company for other reasons.  (See generally ESOP Plan, § 11.)  The named Plaintiffs and putative class members fall within the latter group and are often referred to as "terminated participants."

According to the ESOP Ownership Plan Document, if an account balance exceeds $3500,[7] no portion of that account may be distributed before the participant attains age 65 without the participant's consent.  (Id. § 11(a).)  In most cases, the King & Prince is required to notify pre-age 65 participants of

---

[7]   This amount was later changed to $5000.

5

the financial consequences of such distribution and his/her right to withhold consent to the distribution without penalty. (Id. § 13(c).)   With respect to terminated participants, an ESOP plan distribution may "commence no later than the Anniversary Date of the *sixth* Plan Year following the Plan Year in which his Service terminates."   (Id. § 11(b).)

On June 3, 1991, the Trustees of the ESOP Plan adopted a written Payment Policy.   The 1991 Payment Policy provided that terminated participants could receive a distribution of their accounts "as soon as possible during the sixth plan year following termination."   Defendants admit that in the years following the implementation of this Payment Policy, distributions to terminated participants were made shortly after the end of the fifth plan year, usually within 2 or 3 months of the Anniversary Date.   In doing so, Defendants used the valuation performed in or around the August following the Anniversary Date.   This method of payment allowed the participants' accounts to receive allocations of appreciated stock value for the final plan year (i.e., the fifth plan year).   In fact, when Defendants made distributions to terminated participants on July 24 of 1997, prior to the August valuation, the participants were paid additional amounts in December labeled "Additional Amounts Due - Share Price Change After Participant Paid."

On June 1, 1999, the Trustees revised the 1991 Payment Policy to provide that terminated participants may receive distributions of their accounts "by not later than the end of the *third* plan year following the plan year of termination."[8] Plaintiffs contend that the Trustees used this vague language so as to allow them to select a distribution date at any time during the third year.   Plaintiffs argue the evidence will show that the Trustees chose to change the distribution dates to a few days prior to the end of the third plan year, thereby depriving the participants of the stock appreciation for the third year.   Indeed, Defendants admit that for Plan Year 1998, distributions to terminated participants were made during the last week in June of 1999, prior to the valuation of stock for the 1998 Plan Year.

The implementation of the 1999 Payment Policy coincides with the King & Prince's repayment of the loan used to fund the stock acquisition.   With its debt repaid, the company expected to show an increased valuation of its stock.   A memorandum dated February 18, 1999, from Defendant Sullivan to Defendant Still, contains a written notation by Defendant Still that he anticipated that stock prices would increase. The time that participants would have to wait to receive

---

[8]   In 2003 the Payment Policy was amended again to reduce the time period that terminated participants must leave their accounts in the ESOP to *two* years.

7

distributions contained in the 1999 Payment Policy became less restrictive; moreover, with a change from 6 years to 3 years, the company was suddenly faced with four years of eligible employees for the 1998 Plan Year distribution as opposed to just one year.  In short, plan participants became eligible for distributions sooner and in greater numbers at a time that the stock value was expected to increase.

Another aspect of the ESOP merits discussion.  According to the ESOP Ownership Plan Document and the Payment Policies, a terminated participant has the right to elect to receive his/her distribution in actual shares of stock.  If the participant elects to receive stock, the participant would have two 60-day time periods (put options) during which to sell such shares to the King & Prince at the appraisal value then in effect.  Most importantly, the second put option period is set for 60 days "following notice of the new appraisal value at the end of the next plan year."  Stated another way, a terminated participant who is paid late in the plan year without benefit of a new valuation, but who elects distribution in stock, would be able to sell the shares at the new valuation during the second put option period and would therefore not be deprived of any appreciation in value.  This participant would also have the advantage of knowing the new valuation when determining whether to even sell contention

8

shares during this second put option period.

It seems to me that only the most sophisticated employee would appreciate the benefit of the put option periods.  This inclination is borne out by the fact that only nine of 318 terminated participants during the period of 1999 through 2003 elected stock distributions: one of which was Defendant Williams, a former executive and a current Trustee, and the other eight were high-level employees who had the highest account balances in their respective distribution years and may have had access to relevant information about anticipated stock valuation.  Further, it is noted that reference to the put option periods does not appear on the consent forms mailed to terminated participants until May 15, 2003.

At the time the 1999 Payment Policy was implemented and an increase in stock value was anticipated, according to Plaintiffs, the Trustees began "an aggressive and comprehensive initiative to minimize the number of outstanding shares and maximize the appraised value of Company Stock, much of which they owned inside and outside the ESOP."  (Pl.'s Brf. in Support of Mot. for Class Cert., at 9-10.)  Part of this initiative involved the alleged coercion of terminated participants to elect distribution through the use of misleading notification letters and inadequate consent forms.

Indeed, if an account balance exceeded $5000, a pre-age-

9

65 distribution could not be made without the participant's consent as provided in Treas. Reg. § 1.411(a)-11(c).   (See ESOP Plan Document, § 11(a) & § 13(c).)   The Treasury Regulation's "Consent Rule" requires the company to give the participant at least 30 days notice prior to the date of distribution and to obtain fully-informed consent.   Consent is not valid

> unless the participant has received a general description of the material features of the optional forms of benefit available under the plan. In addition [for distributions before age 65] a participant must be informed of the right, if any, to defer receipt of the distribution.   Furthermore, consent is not valid if a significant detriment is imposed under the plan on any participant who does not consent to a distribution.

Treas. Reg. § 1.411(a)-11(c)(2)(I).

An examination of the "Consent Forms" mailed with the notification letters during the relevant time period is illuminative.   It was never explained that a participant's distribution would not reflect the stock valuation for the year in which the distribution was made, even though the participants were not notified of their right to distribution until the last month of that year.   That is, participants were told that it was "anticipated" that distributions would be made the last week of June, which is the last week of the Plan Year, but they were not told that the distributions would be based upon the valuation of the prior Plan Year.   Also, the

10

participants were never given the required thirty-day notice. The letters never explained that a participant had a right not to elect distribution, instead stating that terminated employees "must begin to receive a distribution."  In fact, in the June 8, 2000 notification letter, participants were told that if they did not elect distribution, their "ESOP account will be converted to cash and invested for you by the Trustees."

Moreover, neither the notification letters or the consent forms provide any explanation of the various options available to a terminated participant.  Defendants admit that they did not mail a revised Payment Policy to terminated participants until May 2003.  For several years, the participants were not given the option to roll over stock into an IRA account. While the participants could elect to receive stock as their distribution, the two put option periods were not explained to the participants until 2003.  In short, it appears that the Trustees did not comply with the Treasury Regulation's Consent Rule in many respects.

Of further interest, none of the revised Payment Policies were submitted to the Internal Revenue Service for review and the ESOP Ownership Plan Document was not amended to reflect the changes made in any of the revised Payment Policies before those changes were implemented.

AO 72A
(Rev.8/82)

**B.    The Plaintiffs**

Four of the five named Plaintiffs in the case testified at the hearing of September 12.   Plaintiff Leonardo Del Rosario began his employment with the King & Prince in October of 1977.  He automatically became a participant in the ESOP in 1991.  As with all participants, Del Rosario received annual statements showing that the number of shares he owned in the ESOP Trust increased every year.  Del Rosario was terminated on June 26, 1999, shortly after the shipping department in which he worked was sold by the King & Prince.  Del Rosario's termination date fell within the 1998 Plan Year.

At the time of his termination, he was told nothing about his interest in the ESOP.  He called the Human Resources Director and was told that he would be eligible to receive an ESOP distribution in 2003.  However, when he called back in early 2002 and talked with Defendant Still, Del Rosario was told that he would be paid the last week of June 2002.  This date of distribution was selected pursuant to the 1999 Payment Policy to pay "by not later than the end of the third plan year following the plan year of termination."[9]

_____

[9]  Del Rosario was actually paid a salary until February 2000 (in the 2000 Plan Year) as part of a severance package, which may explain why he was first told that his distribution would be made in 2003.

12

In June of 2002, Del Rosario received a notification letter informing him that he was eligible for an ESOP distribution and that such distributions would be made in the last week of June. The letter instructed that King & Prince "must have your consent form signed and returned." The consent form contained three options: (1) receipt of common stock in the King & Prince; (2) receipt of cash; or (3) roll over the cash value into an IRA account. Del Rosario chose the third option to avoid tax consequences and mailed back the form.

Del Rosario testified that after signing the consent form, he called Defendant Still to ask whether he could just keep the money in the ESOP. Defendant Still allegedly informed Del Rosario that if he kept his money in the ESOP Trust, the Trustees would cash out the money and buy stock in companies other than the King & Prince.[10] Del Rosario testified that he did not want different stock because he had more confidence in the King & Prince stock than any other.

On June 27, 2002, the King & Prince paid Del Rosario a cash value of $193,680.46, which was rolled into his IRA account. This amount was based upon the value of the stock as

---

[10] Interestingly, the notification letter dated June 8, 2000 - two years earlier - issued this same warning that if a participant did not elect to receive a distribution, the shares of King & Prince stock would be converted to cash and re-invested by the Trustees.

13

of the 2001 Plan Year.  The 2001 Plan Year ended two days later, on June 29, 2002, and the value of the stock was subsequently increased by 45.8%.  The ESOP account balances were adjusted as of June 29, 2002 to reflect the increase. Upon learning of this increase in September 2002, Del Rosario called Defendant Brubaker to inquire as to when he could expect to receive a distribution for the difference reflecting the stock appreciation for the 2001 Plan Year.  To Del Rosario, the difference is over $86,000.  Del Rosario was told he would not be receiving the value of the stock appreciation. Del Rosario was never told before signing his consent form that the King & Prince would use one-year-old valuations in assessing value.

Plaintiff Evelyn West was an employee of King & Prince from 1985 to 1999, and like Del Rosario, West terminated her employment during the 1998 Plan Year.  West received the same notification letter regarding her distribution eligibility in June of 2002.  West testified that she called Defendant Still and was told that she must sign the consent form to receive the money.  West was not told that she did not have to elect a distribution.  West also chose option three - to roll the cash value into an IRA account.

West testified that she thought she would receive the value of the stock as of the time she signed the consent form.

14

On June 27, 2002, West was paid $48,777.71 based upon the 2001 Plan Year valuation.  When she received information concerning the valuation after the 2001 Plan Year, she thought she had been deprived of the stock appreciation.  To West, the stock appreciation accounts for a difference of over $21,000.  West testified that she did not know that she could have left her stock in the ESOP Trust or that she could have rolled the stock into her IRA account (neither option appearing on her consent form).

Plaintiff Evelyn G. Nazzrie terminated her employment from King & Prince on February 15, 2001.  She received a notification letter and consent form dated May 15, 2003, in the second plan year following her termination plan year.[11] Her consent form, however, contained an option that she could roll over her stock into an IRA account.  The consent form also contained a description of the two put options that would be available to participants who elected payment in the form of stock.  However, Nazzrie was not told that she did not have to elect a distribution.  Nazzrie also chose to roll over the cash value into an IRA account.

Nazzrie was under the impression that the value of her

---

[11]   This notification letter informed participants that the waiting time for pre-age 65 distributions had been changed to two plan years following termination rather than three. This change was made pursuant to the Payment Policy of May 15, 2003.

15

stock would be fixed as of the date she signed the consent form. However, she was paid on the valuation of the 2002 Plan Year on June 19, 2003, in the amount of $86,146.14. Nazzrie complains that she missed out on the increased valuation of the 2003 Plan Year - an increase of 77.5% - for a difference of over $65,000.

Plaintiff Wardine F. Taylor terminated her employment with the King & Prince on May 18, 2000, or in the 1999 Plan Year, after nearly 25 years of employment. She was sent a notification letter and consent form dated May 15, 2003 - in the third plan year following her plan year of termination.

Like Nazzrie, Taylor signed the consent form and received a check dated June 19, 2003, for $109,851.13, which she rolled into an IRA account. Taylor claims she is owed more than $34,000 reflecting the difference in valuation from appreciation of stock for the 2002 Plan Year.

Plaintiff John A. Parker did not testify at the hearing, but the record indicates that he terminated his employment in the 2000 Plan Year and was thus eligible to receive a distribution at the same time as Plaintiff Evelyn Nazzrie, at the end of the second plan year following the plan year of his termination. Parker elected a cash payment and received $112,321.34 on June 19, 2003.[12] Parker complains that he is

---

[12] $28,080.33 was withheld for taxes.

AO 72A
(Rev.8/82)

owed over $107,000 reflecting an increase in stock value during the 2002 Plan Year.

Very few participants that received distributions elected to retain the stock as opposed to cash for the value of the stock. When participants were cashed out of the ESOP, such as in the cases of the named Plaintiffs, the King & Prince bought the participant's shares and then retired the stock, thereby increasing the percentage of ownership for the general shareholders still participating in the ESOP.

## C.   The Claims[13]

### 1.   Count I

In Count I, Plaintiffs seek to recover benefits they believe they are owed under the ESOP pursuant to ERISA § 502(a)(1)(B).  Section 502(a)(1)(B) provides:

> A civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B).  Plaintiffs contend the Trustees used the revised Payment Policies to substantially reduce the amount they would have received in the absence of these

---

[13] The relevant claims for purposes of class certification may be found in the Del Rosario Amended Complaint denoted Counts I, III, and V.

17

revisions.  First, the Trustees reduced the period of time that the terminated participants are permitted to leave their accounts in the ESOP Trust.  Second, the Trustees accelerated the annual distribution date from shortly after the end of each plan year to a date immediately before the end of the plan year so that terminated participants are deprived of the stock appreciation for the final plan year that their accounts are held in the ESOP Trust.  Plaintiffs complain that the revisions violated the anti-cutback rule set forth in 26 U.S.C. § 411(d)(6) and as expressly stated in the 1991 SPD.[14] Plaintiffs also contend that Defendants did not comply with the requirements for issuing SPDs in violation of federal law.

Additionally, Plaintiffs contend that the consent forms sent to Plaintiffs informing them of their eligibility for distribution did not meet the requirements for valid consent under 26 U.S.C. § 411(a)(7).  Specifically, Plaintiffs claim that the consent forms were designed to lead them to believe they would receive the stock appreciation value for the current plan year.  The consent forms also did not provide the required thirty-day election period.

In light of these allegations, Plaintiffs seek to recover the benefits that they would have received if the Payment

---

[14]  The 1991 SPD provides: "In no event . . . shall any amendment: . . . . cause any reduction in the amount credited to your account . . . . ."

AO 72A
(Rev.8/82)

Policies had not been revised and if they had been given proper notice. Specifically, Plaintiffs ask to have "their account balances nominally restored" and to receive "new distributions with allocations of Company stock appreciation for the period between the first distribution date to the second distribution date, which distribution date will be elected by the now fully-informed Plaintiffs." (Am. Compl. ¶ 34(d).) Plaintiffs suggest that every terminated employee that received distributions pursuant to the revised Payment Policies should be members of a class.

### 2.   Count III

Plaintiffs expressly pled Count III of the Amended Complaint as an alternative to Count I. Count III alleges that Defendants breached certain fiduciary duties owed to Plaintiffs under ERISA. Section 502(a)(3) of ERISA allows for such claims of breach, providing:

> A civil action may be brought by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3); see Varity Corp. v. Howe, 516 U.S. 489 (1996) (holding that ERISA § 502(a)(3) authorizes lawsuits for individualized equitable relief for breach of fiduciary

19

obligations).

In Count III, rather than expressly state what fiduciary duties were owed to Plaintiffs and how these duties were breached, Plaintiffs simply incorporate all previous allegations of the Amended Complaint. Accordingly, it appears that Plaintiffs assert that Defendants breached their fiduciary obligations under ERISA by implementing the revised Payment Policies in violation of federal law and the ESOP Plan Ownership Document, as more specifically discussed above.

### 3.   Count V

In Count V, Plaintiffs claim that Defendants breached their contract with them, i.e, breached the terms of the ESOP Plan Ownership Document when they revised the payment policies and failed to provide appropriate notice.

### II.   DISPOSITIVE MOTIONS

In the Del Rosario case, Defendants moved for partial judgment on the pleadings on various grounds, notably seeking judgment with respect to Count III (breach of fiduciary duty) and Count V (breach of contract).  In the Taylor case, Defendants moved to dismiss certain counts of the Taylor complaint, notably Count III (breach of fiduciary duty) and Count V (breach of contract).  The legal issues raised by

AO 72A
(Rev.8/82)

these dispositive motions are identical and thus may be considered together herein.

With respect to the breach of contract claim (Count V in both cases), Plaintiffs concede that the claim is duplicative of their benefits claim in Count I. (Pls.' Resp. to Defs.' Mot. for Partial Dismissal of the Compl., at 1, *as filed in the Taylor case.*) Accordingly, Count V of both the Taylor and Del Rosario complaints will be dismissed.

I will now turn to Defendants' motion regarding Plaintiffs' breach of fiduciary duty claim (Count III in both cases), which has been pled in the alternative to the benefits claim found in Count I. Defendants argue that such alternative pleading is expressly proscribed by Eleventh Circuit and Supreme Court precedent. Plaintiffs respond, however, that the breach of fiduciary duty claim should not be dismissed because they may be unable to recover benefits under § 502(a)(1)(B).

In Varity Corp. v. Howe, 516 U.S. at 512, the Supreme Court held that Congress authorized claims by individuals for breach of fiduciary duties under § 502(a)(3), ERISA's "catchall" provision. This holding was premised upon the Court's finding that the plaintiffs had no other available remedy under ERISA. Id. at 515. Following Varity Corp. v. Howe, the Eleventh Circuit held that a plaintiff with an

adequate remedy under § 502(a)(1)(B) for benefits cannot also seek a remedy under § 502(a)(3). <u>Katz v. Comprehensive Plan of Group Ins.</u>, 197 F.3d 1084, 1088-89 (11th Cir. 1999); <u>see also Ogden v. Blue Bell Creameries USA, Inc.</u>, 348 F.3d 1284 (11th Cir. 2003) (holding that the plaintiff has no claim under § 502(a)(3) where there is an adequate remedy elsewhere in ERISA even if that adequate remedy is barred by the doctrine of *res judicata*); <u>Hembree v. Provident Life & Accident Ins. Co.</u>, 127 F. Supp. 2d 1265 (N.D. Ga. 2000) (holding that the plaintiff could not seek equitable relief under § 502(a)(3) because she had a § 502(a)(1)(B) claim for benefits, even though such claim was barred by the applicable statute of limitations). The Eleventh Circuit's <u>Katz</u> decision is based on language from <u>Varity Corp. v. Howe</u>, in which the Supreme Court stated, "we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" 516 U.S. at 515. The Eleventh Circuit interpreted this language as declaring that if a plaintiff is afforded adequate relief by the right to bring a claim for benefits under ERISA § 502(a)(1)(B), an additional claim under § 502(a)(3) cannot be plead. <u>Katz</u>, 197 F.3d at 1088-89. The remedy under § 502(a)(3) is unavailable as an additional remedy, according to

the appellate court, even if a plaintiff does not actually succeed on his or her claim. Id. at 1089 ("[T]he availability of an adequate remedy under the law for Varity purposes, does not mean, nor does it guarantee, an adjudication in one's favor.").

While Plaintiffs in this case recognize the existence of Katz, they argue that the Eleventh Circuit has sanctioned the use of alternative pleading "to cover the risk that they cannot fully recover under Section 502(a)(1)(B)." (Pls.' Resp. to Defs.' Mot. for Partial J. on the Pleadings, at 7.) Plaintiffs cite to Jones v. American Gen. Life & Accident Ins. Co., 370 F.3d 1065 (11th Cir. 2004), in support of this argument. Plaintiffs contend that they may not be able to recover the benefits due to them under § 502(a)(1)(B) because the ESOP is a defined contribution plan in which all assets are allocated to individual account, that is, there are no unallocated assets from which to recover their benefits.

Plaintiffs cite to no authority for the proposition that benefits cannot be recovered from a defined contribution plan through a § 502(a)(1)(B) claim. Indeed, the Eleventh Circuit allowed a plaintiff to bring a claim for benefits under § 502(a)(1)(B) against a defined contribution plan in Hunt v. Hawthorne Assocs., Inc., 119 F.3d 888 (11th Cir. 1997). To be sure, Defendants concede that they will be able to fully

23

satisfy any judgment rendered against them through the ESOP by characterizing the judgment as a loss of principal and paying the judgment from each participant's individual accounts in a share proportional to their interest in the ESOP.   (Defs.' Reply Brf. to Mot. for Class Cert., at 7.)   In short, Plaintiffs' argument that it may not be able to recover benefits from the ESOP is without merit, and thus, the alternative pleading under § 502(a)(3) is precluded.

Moreover, the <u>Jones</u> case cited by Plaintiffs is inapposite.   In <u>Jones</u>, 370 F.3d 1065, the Eleventh Circuit reversed the decision of the district court to dismiss the alternatively pled fiduciary breach claim in accordance with <u>Katz</u>.   The Eleventh Circuit held that the district court had misapplied <u>Varity</u> and <u>Katz</u>, explaining that "for purposes of establishing whether the [plaintiffs] had stated a claim under Section 502(a)(3), the district court should have considered whether the allegations supporting the Section 502(a)(3) claim were also sufficient to state a cause of action under Section 502(a)(1)(B), regardless of the relief sought, and irrespective of [plaintiffs'] allegations supporting their other claims."   <u>Jones</u>, 370 F.3d at 1073-74.   Further, the Eleventh Circuit explained that "the relevant concern in <u>Varity</u>, in considering whether the plaintiffs had stated a claim under Section 502(a)(3), was whether the plaintiffs also

AO 72A
(Rev.8/82)

had a cause of action, **based on the same allegations under Section 502(a)(1)(B)** or ERISA's other more specific remedial provisions." Id. at 1073 (emphasis added). In Jones the plaintiffs' breach of fiduciary duty claim was premised upon different allegations of misconduct than their claim for benefits.[15] Thus, the plaintiffs in Jones should have been permitted to plead the breach of fiduciary duty claim as an alternative to the claim for benefits. Id. at 1073-74.

In the instant case, Plaintiffs' claims for benefits and for breach of fiduciary duty are premised upon the same allegations of misconduct by Defendants, that is, the implementation of revised Payment Policies. Both claims seek an award of benefits of which Plaintiffs were allegedly deprived by the revised Payment Policies. Stated another way, if the allegations of misconduct are sufficient to state a claim for benefits under § 502(a)(1)(B), and Defendants concede that they are, then Plaintiffs are precluded from asserting these *same* allegations of misconduct through a breach of fiduciary duty claim under § 502(a)3). This ruling

---

[15] Specifically, the plaintiffs' claim for benefits was based upon their contention that the plan at issue was ambiguous as to whether their group life benefit had vested. Jones, 370 F.3d at 1070. The plaintiffs' claim for breach of fiduciary duty was not based upon the withholding of a vested benefit, but a claim that the defendant "engag[ed] in a systematic pattern of misrepresentation" that caused the plaintiffs to believe their life insurance benefits would not be changed. Id. at 1071.

25

is consistent with the Jones decision.

Upon the foregoing, Defendants' motion for partial judgment on the pleadings in the Del Rosario case is **GRANTED IN PART** in that Defendants are entitled to judgment as to Counts III and V.  The remaining issues of Defendants' motion for partial judgment on the pleadings are deferred. Consequently, Defendants' motion for partial dismissal of the Taylor complaint is also **GRANTED IN PART** in that Counts III and V are dismissed.  The remaining issues of said motion unaddressed herein are likewise deferred.

### III.  MOTION FOR CLASS CERTIFICATION

Having determined that the only remaining claim to which Plaintiffs wish to certify a class is Count I, the claim for the recovery of benefits under the ESOP, I will now turn to the issue of class certification.  Plaintiffs propose the following class definition:

> All terminated participants[16] who received distributions from the ESOP Trust during the period 1999 through 2004, under the revised Payment Policy, as interpreted and implemented by the Trustees, within 30 days before the last day of any plan year that ended during the period 1999 through 2004.

_____

[16]  The term "terminated participants" shall be defined as those employees who left the Company for reasons other than retirement at age 65, disability or death.  (See generally ESOP Plan, § 11.)

AO 72A
(Rev.8/82)

As previously discussed, Plaintiffs contend that all members of the proposed class were deprived of benefits when Defendants implemented the revised Payment Policies in violation of the terms of the ESOP, the Summary Plan Description (SPD), and federal law. Plaintiffs also contend that all members of the proposed class were injured by Defendants' failure to comply with various notice and consent requirements.

The requirements for class certification are set forth in Rule 23 of the Federal Rules of Civil Procedure. A class can be maintained only if it satisfies the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). Amchem Prod., Inc. v. Windsor, 521 U.S. 591 (1997). The proponent of the class bears the burden of proof on the propriety of class certification. Rutstein v. Avis Rent-A-Car Systems, Inc., 211 F.3d 1228, 1233 (11th Cir. 2000). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974). Whether class certification lies under Rule 23 is a matter left to the discretion of the district court. Armstrong v. Martin Marietta Corp., 138 F.3d 1374, 1386 (11th Cir. 1998).

27

**A.   Rule 23(a)**

Rule 23(a) allows a representative class member to bring an action on behalf of the class only if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

These four elements are commonly abbreviated as numerosity, commonality, typicality, and adequacy of representation. Piazza v. Ebsco Indus., Inc., 273 F.3d 1341, 1346 (11th Cir. 2001).

*Numerosity*

Plaintiffs claim that they have discovered the names of 318 individuals who fall within the proposed class definition from records produced by Defendants.[17]  Joinder of this number of putative class members would be impracticable.  Therefore, the class satisfies the numerosity requirement.   Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1553 (11th Cir. 1986) (stating that the numerosity requirement is generally

_____

[17]   Defendants do not seriously dispute this number; instead, they argue that the 318 individuals cannot be classified as members of the proposed class because (1) the "class" does not exist since the alleged changes to the ESOP distribution policy did not occur, and (2) the members are not similarly situated.

28

met where the proposed class has more than 40 members).

### *Commonality*

To satisfy the "commonality" requirement, Plaintiffs must show that there are questions of law and fact common to the class.  Indeed, a class may be certified if there is but one common question of law or fact.  See Cox, 784 F.2d at 1557; Buford v. H & R Block, Inc., 168 F.R.D. 340, 349 (S.D. Ga. 1996).  Individual claims of the putative class members need not be factually or legally identical.   Jones v. American General Life & Accident Ins. Co., 213 F.R.D. 689, 694-95 (S.D. Ga. 2002).  Moreover, factual differences among members of the class do not destroy commonality if common questions of law exist.  Cox, 784 F.2d at 1557.

The Eleventh Circuit has stated that claims generally involve common questions of law or fact where the allegations of wrongdoing involve a common course of conduct by the defendants.  Kennedy v. Tallant, 710 F.2d 711, 717 (11th Cir. 1983); see also Haitian Refugee Center v. Nelson, 694 F. Supp. 864, 877 (S.D. Fla. 1988) ("Commonality . . . exists when plaintiffs allege that a defendant has acted or is acting uniformly regarding a class.").  Plaintiffs in this case allege a common course of conduct -- the wrongful revision of Payment Policies which caused the class members to lose

29

benefits to which they otherwise would have been entitled.  In assessing Defendants' liability on this issue, common questions of law and fact include but are not limited to:

(1)   Whether the revisions to the Payment Policies are legal and enforceable, particularly since Defendants failed to amend the changes into the ESOP Plan Ownership Document;

(2)   Whether the reduction of the number of years that Plaintiffs could leave their accounts in the ESOP Trust violated the anti-cutback rule;

(3)   Whether Defendants changed the Payment Policy to distribute accounts immediately before the end of the Plan Year to deprive participants of the value of one year's stock appreciation, and if so, whether such change violated the anti-cutback rule; and

(4)   Whether Defendants violated the consent and notice requirements

   (a)   by failing to provide an adequate "description of the material features of the optional forms of benefit;"

   (b)   by failing to properly disclose to Plaintiffs that distributions would be made immediately before the end of the Plan Year and would not include allocation of stock appreciation for the distribution year; and

   (c)   by failing to provide the required notice and consent forms at least 30 days before the distribution dates.

In light of these common questions of law and fact, the commonality requirement is satisfied.  Defendants argue that there exist conflicts between the economic interests of the class members of different plan years and that there exist individual issues unique to each class member.  While some factual or legal differences may exist between the class

members' claims, the overarching issue of the legality of the revised Payment Policies provides a sufficient common bond.

### *Typicality*

To satisfy the "typicality" requirement, the named Plaintiffs must present claims that are typical of those of the class. The focus is on "whether the named representatives' claims have the same essential characteristics as the claims of the class at large." Appleyard v. Wallace, 754 F.2d 955, 958 (11th Cir. 1985).

Typicality is closely aligned with commonality. The Eleventh Circuit has explained the "typicality" requirement as follows:

> A class representative's claims or defenses must be typical of the claims or defenses of the class. In other words, there must be a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class. A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. Typicality, however, does not require identical claims or defenses. A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class.

Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1337 (11th Cir. 1984) (internal citations omitted); see also Appleyard, 754 F.2d at 958 ("[C]ourts have found a strong

31

similarity of legal theories will satisfy the typicality requirement despite substantial factual differences."); Andrews v. AT & T Co., 95 F.3d 1014, 1022 (11th Cir. 1996) ("Typicality exists when a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff.").

The typicality requirement is satisfied in the instant case. The claims of the named Plaintiffs and those of the proposed class members all arise from the same conduct -- the implementation of the revised Payment Policies through which the Trustees were able to acquire corporate stock sooner and at a heavily discounted value considering the appreciated stock values the company did not have to pay during the relevant time period. These claims rest upon Plaintiffs' unified legal theory that these revisions violated the terms of the ESOP, the SPDs and federal law. The claims will be evaluated through an examination of the same course of conduct by Defendants. Moreover, the named Plaintiffs and the proposed class members all seek recovery of benefits to which they otherwise would have been entitled had the Payment Policies not been revised. Thus, Plaintiffs' injuries are typical of the injuries suffered by all class members.

Defendants contend that the named Plaintiffs are atypical of the class because they are the only ones to have exhausted

32

their administrative remedies. No court in the Eleventh Circuit has addressed the issue of whether all class members must exhaust their administrative remedies prior to class certification, and there is some split of authority on the issue in other federal circuits. Nevertheless, while ERISA plaintiffs typically must exhaust their administrative remedies before filing a lawsuit under Section 502(a)(1)(B), exhaustion is not required "when resort to the administrative route is futile or the remedy is inadequate." Curry v. Contract Fabricators, Inc., 891 F.2d 842, 846 (11th Cir. 1990). Because the claims at issue in this case all arise out of the application of the revised Payment Policies, I conclude that the administrative route for the 318 potential class members would have proved futile. Indeed, the appeals of Plaintiffs who administratively challenged the distribution practices under the revised Payment Policies were denied based upon identical grounds, i.e., that the distributions were consistent with the ESOP Plan Ownership Document and the Payment Policies in effect at the time of the participant's termination; that the distribution policies fully comply with federal law; and that the notice and consent forms are legally adequate and unambiguous. Thus, I conclude that the administrative remedies aspect of this case does not defeat Plaintiffs' typicality showing.

33

*Adequacy of Representation*

The last requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." This requirement consists of two components: (1) adequacy of the named representatives, and (2) adequacy of counsel. Buford, 168 F.R.D. at 351. Defendants do not dispute the qualifications or competence of Plaintiffs' counsel. I have reviewed the affidavits of Plaintiffs' counsel and note their experience in class action litigation. I have no reason to doubt that counsel would represent the class in a professional and competent manner.

With respect to the adequacy of the named representatives, Defendants argue that the named Plaintiffs are not adequate to represent the putative class because the economic interests of Plaintiffs Del Rosario and West conflict with participants that received distributions in later plan years, i.e., after the 2001 Plan Year. Defendants contend that a remedy through which Plaintiffs Del Rosario and West are awarded a larger distribution in the 2001 Plan Year (by using the 2002 Plan Year valuation) may necessarily result in lower valuations during the ensuing plan years and thus lower distributions. Stated another way, any method of redistribution or reallocation of stock value could result in lower valuations for every year but the first plan year of the

34

proposed class.     Thus,  so  Defendants'  argument  goes, Plaintiffs Del Rosario's and West's interests are not aligned with the participants receiving distributions in other plan years.

In this case, Plaintiffs essentially seek to nullify the revised Payment Policies and implement the 1991 Payment Policy to the accounts of all class members, whereby the class members will be able to keep their accounts in the ESOP for a longer time and receive their distributions shortly after the valuation of the last plan year in which they participate in the account.   Class members will be provided with more detailed information about their options such that they are able to make an informed decision about whether to keep their accounts in the ESOP Trust.   Defendants' argument that the application of the 1991 Payment Policy will have a negative effect on the valuation of all stock after the first plan year of the class is speculative.   There is no evidence that the remedy will actually drive down the valuation of the stock to a point that the class members would be better off not to participate in this lawsuit. As Plaintiffs state: "Any value that class members might lose in their ESOP accounts if Defendants are forced to comply with the 1991 Payment Policy would be more than offset by the gains that class members would receive if they were allowed to leave their stock in

35

the ESOP until age 65 . . . or even for five years." This Court does not have the means to evaluate the net effect of class certification on all class members to a degree that it can be said the named Plaintiffs are inadequate class representatives. To the contrary, it appears that all putative class members were harmed in the same way that Plaintiffs were harmed -- they were deprived of stock appreciation value to which they would have otherwise been entitled had the 1991 Payment Policy remained in effect. Plaintiffs seek to reinstate the 1991 Payment Policy and more fully inform class members about their options respecting their ESOP accounts. Without evidence that the reinstatement of the 1991 Payment Policy with fully informed notice to participants would necessarily result in detrimental results for class members other than Plaintiffs Del Rosario and West, I am persuaded that the named Plaintiffs fairly and adequately seek to protect the interests of the other class members.


**B.    Rule 23(b)**

A class can be maintained only if it satisfies the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). <u>Amchem Prod., Inc.</u>, 521 U.S. 591. The four requirements of Rule 23(a) having been satisfied, the analysis now turns to Rule 23(b). Rule 23(b) requires a class

AO 72A
(Rev.8/82)

to proceed under one of four possible labels: (a) as an incompatible standards class under Rule 23(b)(1)(A); (b) as a limited fund class under Rule 23(b)(1)(B); (c) as an injunctive class under Rule 23(b)(2); or (d) as a class where common issues predominate under Rule 23(b)(3). Plaintiffs seek certification under Rule 23(b)(1)(A) and Rule 23(b)(3).

### Rule 23(b)(1)(A)

A Rule 23(b)(1)(A) class is appropriate under circumstances "in which the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Stated another way, Rule 23(b)(1)(A) class certification is used to avoid situations in which "separate suits would trap the party opposing the class 'in the inescapable legal quagmire of not being able to comply with one such judgment without violating the terms of another.'" Jones, 213 F.R.D. at 697 (quoted sources omitted). Because of the purpose behind Rule 23(b)(1)(A) class certification, only actions seeking declaratory or injunctive relief can be certified under this rule. See In re Dennis Greenman Sec. Litig., 829 F.2d 1539,

AO 72A
(Rev.8/82)

1545 (11th Cir. 1987).

In this case, Plaintiffs contend in brief that they have asserted a claim for declaratory relief. Upon review of the Amended Complaint, however, the only mention of declaratory relief is made in Paragraph (c) of the Prayer for Relief: "[t]hat the Court issue a declaratory judgment under ERISA § 502(a)(1)(B) to clarify the rights of all active and inactive ESOP participants **who have not yet received distributions** . . . ." Plaintiffs' reliance upon this prayer for relief is curious in that participants "who have not yet received distributions" would not be part of the proposed class. Hence, Plaintiffs have not set forth a class claim for declaratory relief, and Rule 23(b)(1)(A) is therefore unavailable.

Rather, Count I of the Amended Complaint (the remaining claim upon which Plaintiffs seek class certification) is more fairly characterized as a claim for the recovery of benefits. While the relief afforded through claims under ERISA § 502(a)(1)(B) are considered equitable in nature, see Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 210-13 (2002), the monetary relief afforded under such claims must still be determined on an individual basis. Certification under Rule 23(b)(1)(A) is simply inappropriate under such circumstances. Accord Spann v. AOL Time Warner, Inc., 219 F.R.D. 307, 321-22 (S.D.N.Y. 2003).

38

*Rule 23(b)(3)*

Rule 23(b)(3) provides that a class can be certified if:

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

The two most important elements of this type of class certification are predominance and manageability. See generally Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1006 (11th Cir. 1997).

The "predominance" inquiry exacts a much more demanding review of the case than the commonality requirement of Rule 23(a)(2). The predominance standard focuses on whether questions and proof common to the class eclipse more individual issues and evidence. Id. at 1005 ("[I]ssues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." (internal quotation marks omitted)).

AO 72A
(Rev.8/82)

In the instant case, I find that common questions predominate. To determine whether common questions predominate, "it is necessary to examine the issues and nature of the proof required at trial." White v. Deltona Corp., 66 F.R.D. 560, 562 (S.D. Fla. 1975). Here, the primary issue at trial involves questions of fact and law common to all class members, to-wit:

(1)   Whether the revisions to the Payment Policies are legal and enforceable, particularly since Defendants failed to amend the changes into the ESOP Plan Ownership Document;

(2)   Whether the reduction of the number of years that Plaintiffs could leave their accounts in the ESOP Trust violated the anti-cutback rule;

(3)   Whether Defendants changed the Payment Policy to distribute accounts immediately before the end of the Plan Year to deprive participants of the value of one year's stock appreciation, and if so, whether such change violated the anti-cutback rule; and

(4)   Whether Defendants violated the consent and notice requirements

   (a)   by failing to provide an adequate "description of the material features of the optional forms of benefit;"

   (b)   by failing to properly disclose to Plaintiffs that distributions would be made immediately before the end of the Plan Year and would not include allocation of stock appreciation for the distribution year; and

   (c)   by failing to provide the required notice and consent forms at least 30 days before the distribution dates.

Resolving these questions turns on a nucleus of facts common to all class members, i.e., Defendants' course of conduct in

40

implementing the revised Payment Policies. Moreover, resolution of the common legal issues (such as the adequacy of notice) require a uniform application and analysis of the law governing ERISA plans. From this nucleus of common facts and application of ERISA law, the primary question--whether Defendants are liable to the class members--will be determined.

Defendants oppose certification under Rule 23(b)(3), arguing that individualized issues "swamp" any common issues of law or fact. Defendants point to several individualized issues, *inter alia*, such as whether a class member had the financial ability to pay any tax implications resulting from an election of a stock distribution; whether written consent was required from the participant prior to any distributions; whether a class members received all of the documents sent by Defendants related to the ESOP; the percentage that the class member was vested in the ESOP; and whether the class member believed the company stock would increase or decrease during their final year in the ESOP. I conclude, however, that the individualized issues noted by Defendants are either irrelevant to the predominant inquiry in the case (the legality of the revised Payment Policies) or relate to the computation of damages. Indeed, the computation of damages may be specific to each class member. Yet, the computation of

41

damages is the simplest thing about this case because it is a matter of mere arithmetic. Moreover, the question of Defendants' liability is an overriding question which precedes any damages computations, and as such, I conclude that common issues predominate over individualized issues.

With respect to the satisfying the manageability criterion of Rule 23(b)(3), consideration of such hinges on fairness and efficiency. In this case, the Court will be required to examine the same ESOP documents, for instance, the Payment Policies and consent forms, and assess the same course of conduct of Defendants to resolve the issues common to the class. If the implementation of the revised Payment Policies was wrongful as to one member of the class, it was wrongful as to all members of the class. Thus, adjudication of these class-wide claims will not create an onerous burden on the Court but will further the interests of judicial economy and promote fairness to the class members.

## IV.   CONCLUSION

In sum, after a rigorous review,[18] the Court finds that Plaintiffs have satisfied the requirements of Rule 23, Fed. R. Civ. P., and that certifying the class at this time will

---

[18]   See Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982) (stating that the court must subject motions for class certification to a "rigorous analysis").

facilitate a fair and efficient resolution of the matter. Plaintiffs' motion for class certification (doc. no. 87) is therefore **GRANTED** with respect to Count I, the Section 502(a)(1)(B) claim under ERISA for the recovery of benefits. Plaintiffs proposed the following class definition:

> All terminated participants who received distributions from the ESOP Trust during the period 1999 through 2004, under the revised Payment Policy, as interpreted and implemented by the Trustees, within 30 days before the last day of any plan year that ended during the period 1999 through 2004.

I believe that the language in this definition is somewhat unwieldy. Therefore, I suggest the following definition in lieu of Plaintiffs' proposal:

> All terminated participants who were eligible to receive a distribution from the ESOP Trust during plan years 1998 through 2003 under either the revised Payment Policy dated June 1, 1999 or the revised Payment Policy dated May 15, 2003, and who indeed received a distribution from the ESOP Trust within thirty (30) days before the last day of any plan year that ended during the period 1999 through 2004.

Counsel for the parties are invited to submit their comments or suggestions with respect to the Court's class definition within ten (10) business days of entry of this Order.

**IT IS FURTHER ORDERED** that counsel submit a status report of the case, especially with respect to the status of discovery and any other scheduling matters. The Court notes that discovery is due to close on February 14, 2006. Counsel

43

are encouraged, although not required, to submit such report as a joint status report.

**ORDER ENTERED** at Augusta, Georgia, this _____ day of March, 2006.

_____
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)